UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE
COMPLAINT OF CHERAMIE                    CIVIL ACTION
MARINE, L.L.C. AND CHERAMIE
DIVE SUPPORT, L.L.C., as owner,          NO. 21-2371
owner *pro hac vice*, and operator of the
M/V ELLIOT CHERAMIE, for                 SECTION: "J"(5)
Exoneration From or Limitation of
Liability

## ORDER AND REASONS

Before the Court are the following motions: a *Motion for Partial Summary Judgment* **(Rec. Doc. 28)** filed by Claimant, Crescent Midstream, LLC ("Crescent"); a *Motion for Partial Summary Judgment* **(Rec. Doc. 29)** filed by claimants Terry Joseph, Nicholas McZeal, and Paul Woods (together with Crescent, "Claimants"); and a *Motion for Partial Summary Judgment* **(Rec. Doc. 31)** filed by Petitioners-in-Limitation Cheramie Marine, L.L.C. ("Cheramie Marine") and Cheramie Dive Support, L.L.C. ("Cheramie Dive," together with Cheramie Marine, "Cheramie"). Cheramie filed an opposition to the Claimants' motions; (Rec. Doc. 36); to which Crescent replied; (Rec. Doc. 41). The Claimants also filed oppositions to Cheramie's motion. (Rec. Docs. 32, 34). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the Claimants' motions should be **GRANTED** and Petitioners-in-Limitation's motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

On June 25, 2021 at approximately 2:45 a.m., an offshore supply vessel named the M/V ELLIOT CHERAMIE ("ELLIOT" or "Vessel") allided with a pipeline

connected to a platform offshore Port Fourchon, Louisiana. Cheramie Dive owned the Vessel, and Cheramie Marine operated the vessel. The parties agree that the cause of the allision was because mate Kenneth Forbes, a Cheramie Marine employee who was piloting the Vessel at the time of the accident, fell asleep while piloting the Vessel from Port Fourchon to another platform. *See* (Crescent's *Statement of Uncontested Facts*, Rec. Doc. 28-2, at 1) ("3. The allision occurred because mate Kenneth Forbes, a Cheramie Marine employee, fell asleep while piloting the Vessel from Port Fouchon to platform VR-397A"); (Cheramie's *Controversion of Claimants' Statement of Uncontested Facts*, Rec. Doc. 36-6, at 1) ("3. Admitted."). As a result of the allision, several persons made personal injury claims, and one company made a claim for property damage.

On December 22, 2021, Cheramie filed a Verified Complaint for Exoneration from or Limitation of Liability. The Court issued the customary order enjoining all claims against Cheramie and the ELLIOT outside of the limitation action and requiring all claims to be filed in the limitation action. (Rec. Doc. 3). Claimants, including the movants in the instant motions, filed answers and claims in May and June 2022, and on August 12, 2022, the Court granted Cheramie's motion for entry of default as to all non-appearing claimants. (Rec. Doc. 16). Crescent's claim in limitation alleges damages suffered to its pipeline as a result of the allision. (Rec. Doc. 7). Joseph, McZeal, and Woods, who were all passengers on board the ELLIOT en route to the platform, allege personal injuries as a result of being dislodged from their bunks as a result of the allision. (Rec. Doc. 4).

On May 26, 2023, Crescent filed the instant motion for partial summary judgment. (Rec. Doc. 28). The following day Joseph, McZeal, and Woods filed a motion for partial summary judgment incorporating and re-averring Crescent's motion and exhibits. (Rec. Doc. 29). Therefore, the Court will refer to Crescent's arguments as either Claimants' or Crescent's arguments. Cheramie filed its motion for partial summary judgment on May 30, 2023. (Rec. Doc. 31)

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would

'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

## PARTIES' ARGUMENTS

Claimants argue that Cheramie is not entitled to protection under the Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.* ("Limitation Act") because (1) Cheramie's negligence or the Vessel's unseaworthiness caused the allision and (2) Cheramie has privity or knowledge of the negligence and unseaworthiness within the meaning of the Limitation Act. (Rec. Doc. 28-1, at 9-11). First, Claimants note that Cheramie "does not appear to seriously contest that Cheramie is responsible for the allision," based on Cheramie's accident report showing its captain fell asleep and the Vessel allided with a stationary platform. *Id.* at 9. Second, Claimants argue that Cheramie has privity or knowledge of the negligence or unseaworthiness that contributed to the accident, including the lack of training on proximity alarms systems aboard the Vessel and lack of a bridge navigation watch alarm system, the lack of training of the crew with respect to fatigue management, and the failure to implement measures to reduce the risk of fatigue. *Id.* at 12.

In opposition, Cheramie states that, based on their deposition testimony, all of the captains were fully aware of the radar and course plotter alarms, but they chose

4

not to use them for reasons individual to each captain. (Rec. Doc. 36, at 2-4). Cheramie also argues that it properly trained the crew, but there was not a risk identified at the time of the allision that would trigger the fatigue management measures. *Id.* at 4-7. Finally, Cheramie argues that its watch crew was only asleep on the job for a small percentage of their man-hours and objects to evidence of the post-2021 accident installation of a bridge navigation watch alarm system (BNWAS) on the ELLIOT as violative of Federal Rule of Evidence 407. *Id.* at 10. Cheramie also objects to evidence based on Plaintiff's expert, Mr. Nadeau's, report because it does not expressly declare that he adopts the opinions contained in the report.[1] *Id.*

In reply, Claimants contend that the evidence that Cheramie installed BNWAS in 2021 qualifies for one of the jurisprudential exceptions to the non-admissibility of subsequent remedial measures: that the purchase of the BNWAS shows Cheramie's knowledge of the dangerous condition and impeaches expected testimony that its policies were adequate. (Rec. Doc. 41, at 2). Claimants also criticize Cheramie's objection to its expert report as highly technical and inappropriate at the summary judgment stage. *Id.* at 3.

In its motion, Cheramie seeks partial summary judgment dismissing Cheramie Dive and placing the value of $777,000.00 as the value of the limitation fund at all times through the conclusion of the litigation. (Rec. Doc. 31-1, at 1). Cheramie contends that Claimants have no evidence on which to base a finding of

---

[1] Cheramie also filed a separate *Motion to Exclude Claimants' Purported Expert Retired Coast Guard Rear Admiral John P. Nadeau* (Rec. Doc. 30). The Court did not rely on the report to decide the instant motions for partial summary judgment so does not address these arguments in this Order.

negligence or unseaworthiness against Cheramie Dive, and no evidence contradicts marine surveyor Tim Anselmi's finding that the post-casualty value of the ELLIOT, plus pending freight, totals that amount. *Id.* at 3-4.

In opposition, Claimants argue that, despite Cheramie's discovery responses that the ELLIOT was bareboat chartered to Cheramie Marine, there is no evidence of a bareboat charter that could absolve Cheramie Dive from liability. (Rec. Doc. 32, at 2-4). They also contend that, even if Cheramie Dive and Cheramie Marine had a bareboat charter agreement, such an agreement does not absolve Cheramie Dive from its obligation to furnish a seaworthy vessel at the inception of the charter nor its negligent acts prior to inception of the charter. *Id.* at 6. Claimants oppose Cheramie's attempt to limit their liability for the reasons set forth in their motions on Cheramie's right to limitation of liability, so they request the motion for partial summary judgment on the value of the limitation fund be denied as moot. *Id.*

## DISCUSSION

### 1. Limitation of Liability

In this matter, Cheramie Marine and Cheramie Dive, the owner and operator of the M/V ELLIOT CHERAMIE, seek exoneration from or limitation of liability under the Limitation of Liability Act, 46 U.S.C. §§ 30521, *et seq.*, formerly 46 U.S.C. § 30501. The Limitation of Liability Act permits a vessel owner to limit its liability with respect to claims arising from the vessel's operation if the owner is without privity or knowledge of the cause of the loss. *SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 472 (5th Cir. 2022) (quoting *In re Hellenic Inc.*, 252 F.3d 391, 394

(5th Cir. 2001)). To determine entitlement to exoneration or limitation of liability, courts employ a two-step process. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). First, the claimant must prove that negligence or unseaworthiness caused the accident. *Id.* Then, the burden shifts to the plaintiff-in-limitation to prove it lacked privity or knowledge or the unseaworthy conditions or negligent acts. *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789 (5th Cir. 2003).

Here, Claimants contend that Cheramie's negligent acts and the unseaworthiness of the Vessel caused the allision and note that Cheramie does not contest its responsibility. (Rec. Doc. 28-1, at 9). Specifically, Claimants point to Cheramie's accident report, which notes that mate Kenneth R. Forbes's activity or operation being conducted at the time of the allision was:

> Underway, at the wheel, I felt a little graugy [sic], walked around the wheelhouse couple times, sat back in the chair. Next thing I looked was platform dead ahead. It was too late, pulled both engines astern & both died, collision.

(Rec. Doc. 28-17, at 2). Claimants also note that Cheramie has not alleged or conducted discovery on the topics of other parties' fault. (Rec. Doc. 28-1, at 10).

As noted above, Claimants bear the burden of proving Cheramie's liability. Because the ELLIOT allided with an oil platform, Claimants benefit from the well-established presumption of fault that arises when a moving vessel strikes a stationary object. *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir.

1977). To rebut the presumption of negligence, "the moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident." *Id.* at 795 (internal citations omitted). Cheramie has not provided any evidence or argument that it was without fault, that the allision was occasioned because of the some issue with the oil platform, or that there was an inevitable accident. Furthermore, because the Vessel allided with a stationary platform while the Vessel's captain fell asleep, the Court finds that Claimants have established acts of negligence and proven that the negligence contributed to the allision. The burden then shifts to Cheramie to prove that it did not have privity or knowledge of those acts.

Despite the law requiring Cheramie to demonstrate it lacked privity and knowledge, Cheramie argues that Claimants have not presented evidence of the required privity and knowledge. Additionally, Claimants argue that Cheramie had knowledge or privity of the negligence or unseaworthiness because Cheramie failed to train its employees on proximity alarms systems aboard the Vessel or obtain a more sophisticated alarm system, failed to train the crew with respect to fatigue management, and failed to implement measures to reduce the risk of fatigue. "Privity or knowledge, sometimes described as 'complicity in the fault,' extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation." *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993). "[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Trico*, 332 F.3d at 789 (internal

quotation marks and citation omitted). However, where the acts of negligence are a result of mere mistakes of navigation, rather than a lack of competence on the part of the crew, the shipowner is not precluded from the limitation of liability. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 356 (5th Cir. 1991) (citing *In re Hellenic Lines, Ltd.*, 813 F.2d 634, 638 (4th Cir. 1987)); *Coryell v. Phipps*, 317 U.S. 406, 412 (1943) ("[o]ne who selects competent men ... and who is not on notice of any defect ... cannot be denied the benefit of limitation ...."). However, a corporate owner cannot satisfy its burden by demonstrating ignorance; it is charged with the knowledge of its managing agents who have authority over the sphere of activities in question. *In re Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996).

### A. Failure to train personnel on use of proximity alarms onboard

In support of their argument that Cheramie was put on notice of the use of proximity alarms to alert asleep or distracted captains of objects in the Vessel's path, Claimants point to a 2018 allision involving another Cheramie captain who fell asleep, and the vessel, the MISS REESE, allided with an offshore platform. (Rec. Doc. 28-1, at 2) (citing Deposition of Ben Cheramie, Rec. Doc. 28-4, at 4-5). Claimants also note that the vessel in this case, the ELLIOT, had proximity alarms on the radar and chart plotter that alert the watch officer of an approaching object within certain range. *Id.*

However, Claimants note that this feature is not mentioned in Cheramie's Safety Management System procedures and there was no policy in place regarding

their use. *Id.* Ben Cheramie, Cheramie Marine's President; Max Cheramie, Cheramie Marine's Vice President; and Ron Brunet, Cheramie Marine's Safety Manager each testified that they were not aware, prior to this incident, that the ELLIOT had an optional alarm on the radar that would sound if the Vessel got too close to something it might collide with. (Deposition of Ben Cheramie, Rec. Doc. 28-4, at 6) ("Were you aware prior to this incident that the ELLIOT had such an optional feature on its radar? No, I was not."); (Deposition of Max Cheramie, Rec. Doc. 28-5, at 3) ("When did you become aware of the existence of that optional radar setting [for the audible alarm]? Okay. Today. Sorry, let me correct—yesterday."); (Deposition of Rob Brunet, Rec. Doc. 28-6, at 3-4) ("So before you arrived for our deposition today were you aware that there was an optional alarm on the radar on the ELLIOT? I was not aware."). Furthermore, mate Kenneth Forbes testified that he had never seen such alarms used on the ELLIOT and had never received any training or instruction on their use from Cheramie, because he believed that the system was just for use when conditions were foggy. (Deposition of Kenneth Forbes, Rec. Doc. 28-8, at 20). The Lead Captain on the ELLIOT also never received any training or instruction on their use from Cheramie. (Deposition of William Pennington, Rec. Doc. 28-7, at 16) (stating that Cheramie did not provide training or safety meetings on using the alarm systems).

In response, Cheramie argues that Claimant's position is a red herring because all of the captains were fully aware of the radar and course plotter alarms and chose not to use them. (Rec. Doc. 36,at 2). Mate Forbes thinks the radar alarm is for foggy season when the visibility is reduced, Captain Pennington  does not use the radar or

course plotter alarms, and Captain Wilton Billiot (another Cheramie captain, who has been a captain since 1984) thinks having to reset the radar alarm every time it goes off could cause a hazard to navigation. *Id.* at 2-4.

In *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, the Fifth Circuit affirmed a district court's denial of limited liability for a crewboat because the owner had privity and knowledge of the captain's negligence and participated in the negligence that caused a collision on the Mississippi River in heavy fog. 332 F.3d 779 (5th Cir. 2003). The captain in *Trico Marine Assets* had never been trained on the vessel's radar unit, failed to check any navigation equipment, decided to run the vessel at full speed with its engine noise drowning out other vessel's signals, without fog signals of its own, misread his radar, attempted to conduct an improper passing maneuver, and collided with another vessel on the river. *Id.* at 783-84. The captain was not wearing a seatbelt, was thrown into the windshield, and lost consciousness, while the vessel was travelling at full speed with no one at the wheel. *Id.* at 785. Ultimately the crew boat struck the other vessel three times, causing damage and injuries. *Id.* In that case, the district court determined that the vessel owner had privity and knowledge of the captain's negligence and participated in the negligence that caused the collision because it failed to provide a lookout, failed to train the captain to use a radar, failed to evaluate the crewboat's seaworthiness or the captain's competence, failed to inspect vessel logs, failed to employ a safety manager, failed to provide safety training or safety manuals, and employed a captain without adequate

11

policies or procedures to guide him. *Id.* at 790. Thus, the district court concluded the vessel should be denied any limitation on its liability. *Id.*

On appeal, the *Trico* court recognized that a vessel owner could not be denied limitation of liability based merely on errors in navigation or other negligence by master or crew, but the case presented more than mere navigational errors. *Id.* (citing *Kristie Leigh*, 72 F.3d at 481-482). Instead, the owner knew the engine noise from the vessel drowned out other vessels' fog signals and sent the captain with a radar system he had no training how to use, resulting in the collision. *Id.* Thus, the vessel owner knew or should have known that the crewboat was unseaworthy and that its captain was improperly trained, and thus the Fifth Circuit affirmed the denial of limitation of liability. *Id.*

More recently, the Fifth Circuit upheld a district court's holding that a vessel owner was entitled to limitation of liability where the better use of a radar system might have helped prevent the allision. *In re Omega Protein, Inc.*, 548 F.3d 361, 374 (5th Cir. 2008). In *Omega Protein*, Omega's vessel allided with an oil platform, and the district court found, at a bench trial, that the captain's negligence was a contributing cause of the allision. *Id.* at 369. The captain, Stewart, failed to maintain a proper lookout and failed to make effective use of the radar. *Id.* The court specifically found that, although Omega did not train Stewart on how to use the anti-collision alarm, "this feature was not very useful because the Gulf is littered with obstructions." *Id.* at 373. Further, the court did not find that radar defects caused the

allision, but instead a "mirror effect" caused by the wheelhouse lights prevented Stewart from seeing out the windows or viewing the radar. *Id.*

Comparing Stewart's actions to those of the captain in *Trico*, who failed to understand what he saw on his radar displays, the Fifth Circuit concluded that although Stewart's better use of navigational aids might have prevented the allision, that does not compel a finding that Stewart was an incompetent master. *Id.* at 374. The vessel owner did not do everything in its power to ensure Stewart knew the full capabilities of the vessel's radar, nor did it have protocol in place dictating when anti-collision alarms should be used. *Id.* Although "this may not be the most prudent way to run a ship," the privity or knowledge standard "only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence." *Id.* Because Omega selected a competent captain who had a "spotless record" working twenty years as a pilot and captain, and the vessel was not unseaworthy, the Fifth Circuit affirmed the limitation of liability. *Id.*

Here, the facts of this case fall somewhere between those in *Trico Marine Assets* and *Omega Protein*, and the Court finds that Forbes' negligence was not merely the result of a mistake of navigation. Utilizing the vessel's proximity alarm, while perhaps less useful in the Gulf in most situations, would have proven useful here and awoken mate Forbes from his sleep while he was tasked with piloting the ELLIOT. Although he had been working as a captain since 1984 and had never fallen asleep at the wheel, Mate Forbes chose not to use the proximity alarms on the radar system because "nobody plans on falling asleep." (Deposition of Kenneth Forbes, Rec. Doc.

36-2, at 13). On the date of the incident, Forbes began feeling groggy, walked around the cabin, went outside, came back in, and his head started bobbing up and down as he fell asleep. *Id.* at 16. Even at that point after recognizing he felt groggy, he did not choose to engage the alarm on the course plotter, because he believed the alarm is for foggy season when the visibility is low. *Id.* at 24.

Crucially, Cheramie's management, including its Safety Manager, were unaware of the availability of the alarms on the vessel, and Cheramie failed to train its captains on those alarms or include the systems in safety policies. These failures indicate that Cheramie could have discovered with reasonable diligence that its captains were unprepared to use the radar alarms on the Vessel. Because of the burden-shifting framework for proving knowledge or privity, Cheramie must overcome a presumption that it had constructive knowledge—"that they should have known of the unseaworthy or negligent condition that caused the injury." *Brister*, 946 F.2d at 356. Simply noting that each captain aboard the vessel knew of the alarms but chose not to use them does not discharge Cheramie of its burden of proving that it did not have constructive knowledge of the negligence in this case.

### B. Failure to train on fatigue management and enforce 12-hour shift limit

Claimants contend that Cheramie failed to properly train its crew on fatigue management and to prevent crew members from working beyond their twelve-hour shifts. Cheramie argues that if Forbes became groggy during his shift, he could have

14

used the fatigue management policy or stop work authority to get help or relief from his shift.

On June 24, 2021, the day before the allision, Forbes conducted watch aboard the Vessel from midnight to noon. From noon until approximately 5:00 p.m., Forbes hauled groceries inside from three pallets loaded via crane up two flights of stairs onto the deck of the vessel from the Stone fuel dock in Port Fourchon. He went to bed around 5:00 p.m. and slept until 10:00 p.m. before getting up for his next shift which started at midnight. Forbes testified that nobody forced him to help unload the groceries and there was sufficient manpower on the vessel to unload them without him. (Deposition of Kenneth Forbes, Rec. Doc. 36-2, at 9).

Masters or pilots are not permitted to work more than 12 hours in a consecutive 24-hour period except in an emergency. 46 C.F.R. § 15.705(d); 46 U.S.C.A. § 8104. Cheramie's Fatigue Management Policy provides the following additional requirements: limit shifts to 12 hours including overtime, allow for periods of normal night's sleep to catch up on sleep debts, allow a 24-hour rest period between each set of shifts for night-shift workers, keep sequential night shifts to a minimum (no more than four nights in a row). (Rec. Doc. 28-12, at 2-3).

Claimants cite to a Ninth Circuit case, *Washington State Dept. of Transp. v. Sea Coast Towing Inc.*, where the captain of a vessel fell asleep while steering, causing an allision. 148 Fed. App'x 612 (9th Cir. 2005). The Ninth Circuit remanded the case for the district court to determine whether the vessel owner, Sea Coast, was able to disprove its knowledge of all the reasons why the captain might have fallen

15

asleep, in addition to proving the absence of a 12-hour violation. *Id.* at 614-15. On remand, the district court determined that, based on the captain's testimony and work logs, Sea Coast met its burden of proof that the captain did not violate the 12-hour limit in the 24 hours preceding the allision. *Dep't of Transp. v. Sea Coast Towing Inc.*, No. C03-166Z, 2006 WL 8454863, at *4 (W.D. Wash. Feb. 28, 2006). Because there was no 12-hour violation, the Court stated it need not determine whether Sea Coast had privity or actual or constructive knowledge. *Id.*

Again, Cheramie is tasked with proving it lacked privity or knowledge of why Forbes might have fallen asleep while steering the Vessel before being entitled to limit its liability. In this case, Forbes violated the 12-hour limit imposed by statute as well as Cheramie's policies in the 24 hours leading up to the allision, even if he did so voluntarily. He worked a shift from midnight to noon, then helped unload groceries from noon to five, and then started working again at midnight before the allision at 2:45 a.m. Additionally, Forbes worked 12-hour night shifts for a 28-day stretch at a time. (Rec. Docs. 36, at 5; 36-2, at 19). Therefore, Forbes work schedule violated both the 12-hour policy and Cheramie's policy to limit the number of night shifts to four days in a row.

Claimants argue that Cheramie had unwritten policies that allowed crew members to work longer hours than allowed, causing fatigue related incidents. (Rec. Doc. 28-1, at 15-16). They point to the fact that Cheramie relied on a "threadbare crew" to carry the pallets of groceries as well as Captain Pennington's testimony that he was scheduled to work 70 days in a row despite a policy of 28 days on, 14 days off.

*Id.* (citing Pennington Deposition, Rec. Doc. 28-7, at 44, 146). Testimony from Ben Cheramie indicates that Cheramie was aware employees worked more than 12 hours in a 24-hour period, did not monitor the crew's work hours, and instead relied on voluntary compliance with the fatigue policies. (Rec. Doc. 28-4, at 2-4).

Additionally, the day before the allision, a new hire, Deckhand Hunter went aboard the ELLIOT and fell asleep around 9:40 p.m. (Rec. Doc. 28-1 at 6). That day, Deckhand Malgum had only had six or seven hours of break between shifts, because it was a shift change day. (Malgum Deposition, Rec. Doc. 28-14, at 2). When Deckhand Malgum tried to wake Hunter around midnight so that Hunter could relieve him, Malgum went to sleep. (Rec. Doc. 28-1 at 6). Hunter, having gone to sleep around two hours before, never got out of bed and was still asleep when the allision occurred. *Id.*

Cheramie provides deposition testimony that Forbes felt he had adequate sleep and when he took over the wheel he did not think he was placing the vessel or crew and passengers in danger. (Rec. Doc. 36-2, at 28). Citing Captain Billiot's deposition testimony, Cheramie also makes note of safety meetings, which Forbes attended, on board the ELLIOT in the weeks leading up to the allision, covering fatigue management and stop work authority. (Rec. Doc. 36, at 7). Finally, Cheramie "place[s the incident] into perspective: over the past five years, Cheramie operated eight vessels, and (including the 2018 incident where a captain fell asleep causing an allision) in the past five years, crew members were only asleep during their shifts for a total of three hours, or 0.0004% of all working shift hours. (Rec. Doc. 36, at 8).

Although Cheramie appears to be attempting to minimize its pattern of fatigued captains falling asleep and causing allisions, this argument does the opposite, and instead demonstrates that serious crashes can occur even if a captain is asleep on the job for a small percentage of time. Considering Ben Cheramie's testimony that the company did not monitor or enforce its own fatigue management policy and the evidence that multiple crew members, including Forbes, violated those policies in the hours leading up to the allision, Cheramie has not sufficiently disproven that it knew or should have known of the fatigue that caused the loss. Accordingly, the Court cannot conclude that Cheramie lacked constructive or actual knowledge of the negligent acts causing the allision.

Because the negligence attributable to the Vessel was a proximate cause of its allision and such negligence was within the privity or knowledge of its owners, the petition for limitation or exoneration from liability must be denied. Cheramie's partial motion for summary judgment to limit the post-casualty value of the ELLIOT plus pending freight must also be denied. The Court's previous Order staying and enjoining claims against Cheramie (Rec. Doc. 3) is **VACATED**, and Claimants may pursue their claims for damages.

### 2.  Dismissal of Cheramie Dive

In its motion for partial summary judgment, Cheramie seeks dismissal of Cheramie Dive, the owner of the ELLIOT, because it claims Claimants have no evidence on which to base a finding of negligence or seaworthiness against Cheramie Dive (Rec. Doc. 31-1, at 3). Specifically, Cheramie alleges that all decisions and

activities aboard the Vessel were performed by or through Cheramie Marine and that there is no evidence that Cheramie Dive conducted any activity with regard to the Vessel. *Id.* at 1.

In opposition, Claimants contend that there is no evidence of a bareboat charter between Cheramie Dive and Cheramie Marine, and even if there was, Cheramie Dive, as the owner of the vessel, is liable for the conditions or negligent acts which pre-existed the inception of the charter. (Rec. Doc. 32). Cheramie stated in an answer to an interrogatory that there was a bareboat charter, but Claimants emphasize that there is no evidence of a bareboat charter, written or otherwise, or of the terms of such a charter. *Id.* at 3.

A vessel owner has the heavy burden of establishing facts that give rise to the relief under a bareboat charter, which allows the owner to escape liability for the condition or management of the vessel in some circumstances. *Complaint of Admiral Towing & Barge Co.*, 767 F.2d 243, 248 (5th Cir. 1985) (quoting *Guzman v. Pichirilo*, 369 U.S. 698, 700 (1962)). In this case, although Cheramie's discovery responses indicate a bareboat charter existed, Cheramie points to no evidence in the record in its motion for summary judgment to bear this heavy burden of proof, nor the burden required of summary judgment movants. Further, Ben Cheramie, one of the two members of Cheramie Dive and Cheramie Marine, testified that there were no contracts or written agreements between Cheramie Dive and Cheramie Marine with respect to the ELLIOT. (Ben Cheramie Deposition, Rec. Doc. 32-2, at 3-4).

19

Because Cheramie has not presented any evidence to absolve Cheramie Dive from liability as the owner of the ELLIOT, the Court must deny its motion for partial summary judgment seeking dismissal of Cheramie Dive.

### 3.  Cheramie's objection to certain evidence

Finally, in its opposition memorandum, Cheramie objects to any evidence about its installation of a Bridge Navigation Watch and Alarm System ("BNWAS") after the accident, pursuant to Federal Rule of Evidence 407. (Rec. Doc. 36, at 10). Rule 407 provides that

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
> · negligence;
> · culpable conduct;
> · a defect in a product or its design; or
> · a need for a warning or instruction.
> But the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407. The Fifth Circuit has held that evidence of subsequent remedial measures is admissible as "proof of subsidiary issues in the case, such as knowledge of the dangerous condition." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1342 (5th Cir. 1978).

A BNWAS would avert this type of accident by monitoring the watch officer's presence and requiring them to press a timer reset or operate navigation equipment at certain intervals. (Rec. Doc. 28-1). Evidence that Cheramie installed this system subsequent to the allision would ordinarily be inadmissible under Fed. R. Ev. 407.

20

Claimants argue that evidence regarding the post-2021 accident installation of a BNWAS is admissible because of the exceptions to the non-admissibility of subsequent remedial measures: impeaching expected testimony that Cheramie's policies were adequate and demonstrating knowledge of a dangerous condition. (Rec. Doc. 41, at 2). Here, Cheramie has made the claim that the alarm systems on the Vessel were sufficient and therefore its captains did not need to use proximity alarms and the company did not need to monitor their fatigue. Therefore, the Court finds that the evidence regarding the BNWAS is admissible as proof of a controverted issue whether Cheramie knew of the dangerous condition.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Crescent's *Motion for Partial Summary Judgment* **(Rec. Doc. 28)** and the *Motion for Partial Summary Judgment* **(Rec. Doc. 29)** filed by claimants Terry Joseph, Nicholas McZeal, and Paul Woods are **GRANTED.** Cheramie is not entitled to limit its liability.

**IT IS FURTHER ORDERED** that Cheramie's *Motion for Partial Summary Judgment* **(Rec. Doc. 31)** is **DENIED.**

New Orleans, Louisiana, this 29th day of June, 2023.

_____

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE